**BROWN v. BROWN.**

No. 4805.

Court of Civil Appeals of Texas. Beaumont.
Jan. 30, 1953.

Rehearing Denied March 25, 1953.

Fulmer & Fairchild, Nacogdoches, for appellant.

Burns & Grumbles, Houston, Dies & Anderson, Lufkin, for appellee.

WALKER, Justice.

This suit was brought to recover the death benefits payable to the widow of a workman under the Workmen's Compensation Law. George Brown was the workman. Merenda Brown, the plaintiff, and Margaret Brown, a defendant, each claim to be the widow of George Brown. George Brown, Merenda Brown and Margaret Brown were negroes. Merenda Brown's claim is founded upon a common law marriage with George Brown which, she testified, was entered into in Louisiana in 1932. Merenda had married one Burnice Jones in 1918, and it was an issue on the trial of this cause whether this marriage with Burnice was void because of a prior marriage between Burnice and one Pearl Sylvis. Margaret Brown's claim is founded upon a ceremonial marriage (that is, one according to the statutes regulating marriage) between her and George Brown in Nacogdoches County on February 8, 1949. Margaret Brown is 16 years younger than Merenda Brown. The other defendant was the Insurer, namely, American Lloyds; and Insurer admitted liability

for the benefits, to whichever of the two claimants was found entitled thereto. ·

The cause was tried to a jury, who returned the following verdict in response to special issues: (1) Burnice Jones was married to Pearl Sylvis when he married the plaintiff in April, 1918, in Marion County, Texas; (2) There was a common law marriage between George Brown and the plaintiff, Merenda Brown; and (3) George Brown did not divorce the plaintiff Merenda Brown before the ceremonial marriage with the defendant, Margaret Brown.

On this verdict the trial court rendered judgment in behalf of Merenda Brown for the benefits payable under the Act, less deductions which are not in issue here. Margaret Brown has appealed from this judgment and has assigned 13 Points of Error for reversal.

The order in which these points are discussed differs from that in which appellant has assigned them.

## Opinion

Under Points 1, 8 and 9, appellant assigns error to the judgment on the ground that the proof did not show that the marriage between Burnice Jones and Merenda Brown had been dissolved; and this is also one of two grounds assigned in Points 6 and 7, which attack the finding under Issue 2 that George Brown and Merenda had made a common law marriage. The other ground of Points 6 and 7 is discussed hereinafter. Under Issue 1 the jury found that Burnice Jones was married to Pearl Sylvis when he married the plaintiff Merenda Brown. Point 1 assigns error to the trial court's action in overruling appellant's motion for instructed verdict and her motion for judgment non obstante. Points 8 and 9 assign as error that the finding under Issue 1 is not supported by the proof, as a matter of law or in fact. The relevant ground of Points 6 and 7 is that plaintiff had a living husband from the beginning of her relation with George Brown. The question we have to decide is whether there is any evidence to support the finding under Issue 1; for if Burnice Jones'

prior marriage to Pearl Sylvis had not been dissolved when Burnice Jones married Merenda Brown, the latter marriage was void and Merenda Brown was competent to marry George Brown.

The witness Pearl Jackson testified as follows: Her maiden name was Pearl Sylvis. She was raised "between Naborton and Dorson, Louisiana, about nine miles out." She knew Burnice Jones (who is referred to throughout her testimony and in the official documents pertaining to her marriage as Burnish Jones). "He and I gone to school together, play children together." They were raised together. She got married in September, 1916, to Burnice Jones, on September 3, 1916. She and Burnice Jones lived together "until November in 1917." Then "he told me he was going to Oakdale and get him a job and go to work, after he sold the bale of cotton, and I never saw him until 1918 when the baby was 8 months old."

She testified further: "Q. Now, when Burnish saw you in August, 1918, how did he address you? A. He said 'Well, hello there, How is the wife and baby getting along? How have you all been getting along?' He picked up the baby and kissed him and gave him half a dollar, and that is all he ever give him." Burnice didn't stay there. "He went to his mother's and father's after he played with the baby around there and I saw him that evening on the church ground and I never saw him again until the baby was six years old."

Pearl Jackson and Burnice Jones were married in Louisiana on September 3, 1916, by a justice of the peace. Certified copies of the license issued by the Louisiana authority and of the return by the officiating justice are in proof. Both the license and the return are dated September 3, 1916. Pearl Jackson's maiden name Pearl Sylvis is used in both documents. The license was issued in DeSoto Parish and the return states that it was made in that parish. It is stated in the certificates to these documents that these certificates were made in Mansfield, Louisiana. Pearl Jackson testified that Burnice Jones got the license at Mansfield, and that they were married by

a justice of the peace "between Naborton and Mansfield."

She testified further that she had never filed a divorce suit against Burnice Jones. "Q. Did Burnish ever have you served with any divorce papers? A. No, sir, he never did. He never mentioned a divorce. Q. Did you ever receive any divorce papers? A. No, sir, I did not."

A calculation from the testimony of Pearl Jackson shows that she had last seen Burnice in 1925; that was when the baby was six years old. Walter Wright testified that he was a first cousin of Burnice Jones and that he last saw Burnice in 1935, (3 years after Merenda Brown's common law marriage to George Brown) in Shreveport, Louisiana. Burnice then appeared to be in good health and all right. Burnice had come to see his mother, who seems to have been in witness' home. Walter Wright testified further that he had not heard from Burnice Jones since 1935 and had not talked to any member of Burnice's family about Burnice since 1935. He did not know where Burnice was and "had not seen Burnish from about 1924 until 1935." He and Burnice did not write. He had no reason to hear from Burnice except that the latter came to see his mother. The witness said that he and Burnice were raised together, but he did not know that Burnice and Pearl Sylvis had married. He had been told that Burnice had a child, but he had not seen the child.

The plaintiff Merenda Brown testified that she was born at Smithland, Texas, in Marion County, out in the country; on a farm. She was 54 years old when the cause was tried and must, therefore, have been born in 1897 and was about 21 years old when she married Burnice Jones. She said that she was raised at Smithland and that she "got to the 6th grade" in school.

She testified that she married Burnice Jones on April 8, 1918. "I met him in 1918, in January." They courted for about three months before they married. From this statement the jury could have concluded that she met Burnice Jones about January 8th, and this date was about two months after Burnice Jones had left Pearl Sylvis. After the marriage she and Burnice lived "at home, at Smithland." Burnice "farmed the first year we married." The second year he did public work. She lived with him "until 1920, in June." Then "he went off to look for a job" and he had never returned. She had never seen Burnice Jones since that time. She had been told that he died in 1922, and she believed this. Other testimony shows that because of this information she thought that she was free to marry George Brown in 1932. She had never heard of Burnice nor from Burnice since he left her. After Burnice left she resided with her mother at Smithland until her mother's death in 1924, and afterwards she resided with her brother until she and George Brown began to live together.

She testified that she had a license to marry Burnice Jones and that they were married by a preacher. She thought that she was legally married to Burnice.

On her pre-trial deposition she testified that she had not seen any children of Burnice Jones'; that Burnice Jones had never talked to her about a wife or any other marriage or any children he had had. Further: "Q. And what did you all separate about? A. Well, he told me he was going off to hunt a job and I guess he's still hunting that job."

■ Points 1, 8 and 9 and the ground of Points 6 and 7 which we have mentioned are overruled. It is not clear that the presumption which appellant invokes in behalf of her marriage with George Brown ought not also to be invoked in behalf of Merenda Brown's common law marriage with George Brown. See: 9 Tex.Law Review 613; Skinner v. Vaughan, Tex. Civ.App., 150 S.W.2d 260. However, this question need not be decided since we have concluded that the proof otherwise supports the finding under Issue 1. There was evidence of the competency of Pearl Sylvis and Burnice Jones to marry. The official acts of the Louisiana authorities are at least some evidence of that fact, at least so far as age is concerned. Further, Burnice Jones and Pearl Jackson had known each other since childhood and had lived in the same community, and the fact that Burnice Jones procured a marriage license which states only Pearl's maiden

name and that the officiating justice's return also used that name are circumstances indicating that Pearl Jackson was an unmarried person at the time of her marriage to Burnice Jones. There was also evidence that Burnice's marriage to Pearl had not been dissolved before Burnice's marriage to Merenda. Burnice left Pearl in Louisiana in November and he met Merenda in Texas about two months later. Since Merenda said that Burnice courted her for about three months afterward the jury could have inferred that Burnice was in Texas throughout this period. It is utterly improbable that Burnice Jones acquired a domicile outside of Louisiana before he came to Texas, and, indeed, in the absence of proof of the law in force in other states during the period from Burnice's abandonment of Pearl in November, 1918, until his marriage to Merenda on the following April 8th, we must assume that the law of those states was like that of Texas and thus conclude that Burnice could not have acquired any domicile outside of Louisiana in which he could have dissolved his marriage to Pearl before he married Merenda. Thus if the marriage to Pearl was dissolved during this period (five months), it must have been done in Louisiana, and the jury could have concluded that if Burnice, a poor negro farmer, who also did public work, was courting Merenda in Texas from a date in early January until April 8th, he was not making trips back and forth between Texas and Louisiana to work a lawsuit and therefore could have reduced this five month period to the two months between Burnice's separation from Pearl and his first meeting with Merenda. Furthermore, it is apparent from Merenda's testimony that she never heard of any suit by Burnice against a former wife because she never heard of a former wife; and there is no apparent reason why Burnice should have concealed such a suit from Merenda. The circumstances justified a conclusion by the jury that the marriage between Pearl and Burnice had not been dissolved before Burnice's marriage to Merenda. The suit for dissolution must have been brought in Louisiana and the period of

time available was short. Merenda had never heard of such a proceeding, and neither had Pearl, although the suit presumably, must have been filed in the parish in which she and Burnice were domiciled when they separated. That, at least, would be the law of Texas, and we have not been informed that the Louisiana law was to the contrary. Burnice did not leave Pearl to get a divorce; he left to sell that bale of cotton and get a job in Oakdale. If he went away to sell the bale of cotton and get a job, there is some possibility that he would have used the price paid for the cotton to maintain himself instead of paying it to a lawyer to dissolve his marriage. When Burnice next saw Pearl after his separation from her, perhaps as much as ten months later, he acknowledged the existence of that marriage by calling Pearl wife and by acknowledging his son. The fact that Burnice and Pearl had a ceremonial marriage, lived together for over a year, and had a son, indicates that there was no ground for an annulment proceeding. When Burnice abandoned Merenda he also told her that he was going to get a job. The jury could have inferred that he did not tell Merenda he was going to leave her permanently, and his failure to communicate with either Pearl or Merenda indicates an irresponsibility which comports more with abandonment than with the institution of litigation to dissolve marriage. Merenda said that she lived at Smithland with her mother for about 4 years after Burnice left her. He could, at least during this time, have communicated with her.

Points 6 and 7 assign error to the finding in response to Issue 2, that Merenda Brown had entered into a common law marriage with George Brown, Point 6 assigning that the proof does not support the finding as a matter of law and Point 7, that the proof is insufficient in fact. Two reasons are stated. One concerns Merenda Brown's marriage to Burnice Jones; it is involved in Points 1, 8 and 9 and has been discussed with those points. The other reason is that Merenda Brown "repeatedly testified that she and George Brown did not consider themselves man

and wife, but did intend to marry at some time in the future."

Merenda Brown testified as follows: She became acquainted with George Brown in Blanchard, Louisiana. She and George courted. They didn't court long. George asked her to marry him. She said "all right". After this she and George lived together. Before then her name was Merenda Jones but afterwards she went by the name Merenda Brown and she does so now and has since 1932. She and George had this conversation on June 16, 1932. She testified further: George told her (she refers to the conversation of June 16, 1932) that he was going to take her and take care of her and put her in a house and work for her. The conversation where George Brown asked her to marry him and she said she would took place at Blanchard at her brother's house on June 16, 1932. "Q. Did you ever after June 16th enter into any kind of an agreement like that? A. June 16th is when we made the agreement. Q. Therefore, after you had it made you would be silly to make another one? A. Yes, sir." She considered him her husband and herself his wife. And from then on she told the world she was his wife, because she knew he was her husband. "Q. You knew, of course, there were preachers and justices of the peace and magistrates all around that you all could have married? A. We were not able. In 1932 he wasn't making but seventy-five cents a day and we couldn't live off that. Q. You considered you would be man and wife and you would not be able? A. Yes, sir. Q. You did get married, though, didn't you? A. Yes, sir, we were married in 1932." On June 16, 1932, George said to her "I have been coming down here several times to see you and I like you. I want you to be my wife." And he said "I will take you and take care of you and work for you and do the best I can about it." She agreed to that. She thought that made her his wife. She had heard of people buying a license and marrying. "Q. And you had done heard of this other, too, had you? A. Yes, sir. Q. Where did you hear of that? A. Old folks used to do that all the time. Yes,

sir, marry like that." She did not have in mind that she could just skip over without getting a divorce. "I loved George and I wanted to stay with him." He loved her. She did legally marry Burnice with a license and a preacher. She figured she was married to Burnice. "Q. Why didn't you go through the same procedure with George? A. We were already married and didn't get around to the preacher. Q. You considered you were? A. Yes, sir." She testified several times that she and George Brown were married in 1932 but not by a preacher.

She testified that after the conversation of June 16, 1932, she and George Brown lived in Blanchard, Louisiana, until a date in April, 1934, and then moved to Avinger, Texas; that they lived in Avinger until a date in September, 1935, and then moved back to Blanchard; that they lived in Blanchard until June 14, 1936, and then moved back to Avinger; that they lived in Avinger until July 22, 1937, and then moved to Garrison, Texas; that in 1939 they moved back to Avinger and lived there for several months in 1939 and then moved back to Garrison; and that they continued to live in Garrison, or at the mill where George Brown was employed, until George Brown abandoned her in March, 1948.

Thus according to Merenda Brown's testimony she and George Brown had lived together for a period of about 16 years before they separated. She said that after she and George started living together she did not go with anybody else. She said that George Brown was in the army from November 2, 1942, until March 31, 1943, and that this was their only separation prior to March, 1948; that she did not live with any man while George Brown was in the army but waited for George Brown; and that when he left the army he returned to her.

There was testimony by Merenda Brown that during this period of some 16 years, she and George Brown had maintained a home and had lived together as husband and wife; that she bore the name Merenda Brown; that George Brown referred to her in public as his wife; and that she was

known as such in the community; that she considered George Brown her husband; that he wrote to her from an army post addressing her as Mrs. Merenda Brown; that he procured burial policies (dated June 1, 1938), one insuring her and payable to him and one insuring him and payable to her; that George Brown paid for food, clothing and rent and that she purchased groceries and other necessities for herself and George with George's funds; and that when George Brown was in the army he sent money to her.

Merenda Brown's testimony about the conduct of George Brown and herself was corroborated for the period she and George Brown lived in Garrison, and this period extended over about 10 years.

Merenda testified as follows about entering into a ceremonial marriage with George Brown: In 1933 George Brown went to the doctor and got a certificate to get married. This was lost when a storm destroyed their house in Blanchard on December 17, 1933. "Q. I thought you said you were already married? A. We were, but we were going to get a license and be married by a preacher." She wanted to get married by a preacher but George just never got around to it. "We were not planning on getting married by a preacher because we were already married. Q. (Counsel refers to her testimony about the agreement of June 16th) Did that fix things from then on, and doing this later? A. As I told you, we were figuring on getting a license and being married by a preacher. It was in 1933. Q. After June 16th you never did have any other agreement with reference to being man and wife, other than by virtue of the agreement you had? A. I said he went and got a certificate in 1933. Q. That was being married by a preacher? A. Yes, sir, that is what I say. Q. (Other than the conversation of June 16th) from that day, June 16th, up until now you and George never had any other discussion concerning you all going to become man and wife? A. Yes, sir, we talked about it. Q. Did you consider that you had already married him as of that agreement on June 16, 1932? A. Yes, sir. We

were married but were not married by a preacher." She considered she was married but not by a preacher. They did talk about having a license and being married by a preacher. They planned on getting married by a preacher until he quit her. June 16th is the only time when she and George had an agreement that they would be man and wife without a preacher.

Substantially every element of Merenda Brown's testimony which tended to prove a common law marriage between her and George Brown (except their living together in Garrison) was disputed by appellant Margaret Brown and much of the proof used by appellant for that purpose was taken from Merenda Brown's pre-trial deposition. In substance Merenda Brown gave testimony during this deposition showing that she and George Brown were not married and knew it but intended to be married. On the trial of the cause Merenda Brown explained such statements by saying that she thought she was being questioned about a ceremonial marriage.

■ The particular ground of Points 6 and 7 which was quoted at the beginning of this discussion is overruled. It may be that the preponderance of the evidence is in appellant's favor but there was enough evidence to raise a question of fact for the jury, whether Merenda Brown and George Brown had actually made a common law marriage or only intended to be married at some time in the future. The conflicts in Merenda Brown's testimony and between the witnesses called by the parties were matters for decision by the jury.

No question has been raised as to the effect which the law of Louisiana had on the agreement between George Brown and Merenda Brown on June 16, 1932, and on the relationship of the two pursuant to and after that agreement; and we have therefore assumed that the law of Louisiana was like that of Texas and that the agreement and relationship had the same legal effect and consequences under the law of Louisiana as under the law of Texas.

Points 2, 10, 11, 12 and 13 raise the question whether there is any proof that the common law marriage between Merenda

Brown and George Brown was *not* dissolved before George Brown married the appellant Margaret Brown, and if such proof there be, then whether it is sufficient in fact. In response to Issue 3 the jury found that George Brown did not divorce Merenda Brown before the marriage to Margaret Brown; and Issues 10 and 11 assign as error that this finding is not supported by the proof. The judgment of the trial court contains this finding: "The court finds that the common law marriage between George Brown and Merenda Brown was not dissolved by annulment or divorce before the ceremonial marriage between George Brown and Margaret Brown." Points 12 and 13 assign as error that this finding is not supported by the proof. Point 2 assigns error to the trial court's action in overruling appellant's motion for instructed verdict and for judgment non obstante.

Merenda Brown testified that George Brown left her on March 13, 1948; and until June 6, 1948, she continued to reside in the same house in which she and George Brown had lived. But on June 6, 1948, she went to Houston with her foster-son, Jessie Harrison, and since then had lived in the home of Jessie Harrison as a member of his family. Jessie Harrison, incidentally, had resided at the same address since Merenda Brown went to Houston.

After his separation from Merenda Brown, George Brown continued to reside in Garrison and on May 3, 1948, less than two months after the separation of these two, the County Clerk of Nacogdoches County issued to George Brown a license authorizing his marriage to appellant Margaret Brown, then Margaret Thomas. George Brown and appellant were married pursuant to this license on February 8, 1949.

At the time of her marriage to George Brown, appellant Margaret Brown resided with her mother in Garrison, and had been residing there, with her mother, for several years before the marriage. She said that George Brown had courted her for two years before they married. This courtship had begun while George Brown and Merenda Brown were living together,

and appellant knew that this relationship existed.

Appellant Margaret Brown testified: "Q. Did George ever get a divorce from Teda (this was a nickname of Merenda Brown) or file suit for divorce? A. No divorce to get. Q. You are positive he never did file suit for divorce? A. No, sir, there wasn't no divorce. They were not married. Q. Did he ever tell you he filed suit for divorce? A. No. He said he was never married until he married me. Q. He told you that after 1948? A. In Garrison. Q. After he walked out on Teda in 1948 then he told you they were not married? A. Yes, he told me they were not married." Further: "he didn't have no papers on her. He said he never had no papers on Teda. Q. What George told you, he wasn't married to her because he didn't have no papers on her? A. He didn't have no papers on her. Just works. Q. Didn't have no papers, just lived together as husband and wife? A. Yes, sir. Q. Just acted like married folks? A. Yes, sir. Just living in the house. Q. Everybody in Garrison knew they acted like married folks but they were not married folks? A. That's right."

Merenda Brown testified that she had never sued George Brown for a divorce. She testified further: "Q. Did you ever file suit for a divorce against George? A. No, sir. Q. Did he ever file suit against you? A. No, sir." She testified further: "Q. You never did make the necessary application for a divorce from George Brown? A. No, sir. Q. You don't know whether George Brown got a divorce from you after he separated in 1948, do you? A. No, sir, he didn't get one. Q. How would you know he did not? A. I wasn't consulted. Q. Of your own knowledge do you know George Brown did not obtain a divorce in some court from you after he left you in 1948 and he died and before he married Margaret? A. I don't think he did. Q. Do you know? A. No, sir."

Eliza Carter testified, in effect, that she was intimately acquainted with George Brown and Merenda Brown, and she said that George Brown stayed with her about

three months after he left Merenda Brown. Her testimony indicates that she had forgotten the length of the period between George Brown's separation from Merenda Brown and his marriage to Margaret Brown, and Margaret Brown testified that George Brown had stayed with Eliza Carter until he married her. However, the fact significant here is that she and George Brown were such good friends. She testified: "Q. First, after George walked out on Teda he came and stayed in the house with me about three months, and I was fussing at him, I wanted him to go back and live with Teda, so he said, 'Eliza, I quit Teda Brown. The only time I wanted to marry and straighten out and try to live a better life than I have.' I said 'Who are you going to marry, George?' And he got up and got the license and showed me and Margaret Thomas was on the license. And I said 'If you think you can marry and better your condition, go ahead on.'" She testified further: "Q. Do you know how long it was after you had that discussion that George and Margaret got married? A. About two weeks afterward."

She testified further: "Q. George never did divorce Teda, did he? A. I don't know nothing about no divorce. Q. You don't know that they did? A. No, sir. Q. You seem to know a great deal about their family life. You don't know of his ever having attempted to divorce Teda, do you? A. No, sir."

The statement of facts contains much evidence that Merenda Brown had cause for divorcing George Brown, but there is no evidence that George Brown had any cause for divorcing Merenda Brown.

█ Points 2, 10, 11, 12 and 13 are overruled. The evidence certainly supports the jury's finding that George Brown and Merenda Brown were never divorced; and if Merenda Brown was required to prove that her common law marriage to George Brown was not dissolved by a suit for annulment, we think that the circumstances prove this fact as a matter of law. George Brown and Merenda Brown lived together as husband and wife for many years in the town of Garrison (it is unnecessary to consider their prior relation), and the only

ground for annulment which George Brown could have had was the marriage between Burnice Jones and Merenda. There is no direct proof that George Brown knew of this marriage; but if he did, and his long relationship with Merenda Brown makes it probable that he did, it would be more in keeping with his character and conduct, as appellant Margaret Brown's own proof describes that, and with the fact that he and Merenda Brown had never had a ceremonial marriage for him simply to abandon Merenda Brown than for him to institute the rather infrequent proceeding of annulment, or, indeed, any proceeding to dissolve his relationship with Merenda Brown. It is to be noted that he procured a license for marriage to appellant while Merenda Brown was still in Garrison and at a date less than two months after his separation from Merenda Brown. His residence was still in Garrison at that time, and the testimony of Merenda Brown which we have quoted shows that she knew nothing of any proceeding to dissolve her relationship with George Brown. Under the circumstances, the marriage license is a circumstance which accords more with an abandonment than with a suit to annul. It is also to be noted that Eliza Carter testified to this declaration by George Brown when he exhibited his marriage license to her: "Eliza, I quit Teda Brown." This, too, is a circumstance indicating simple abandonment. The marriage to Margaret Brown was not entered into until about nine months after the marriage license was issued; but if George Brown filed any suit for divorce or for annulment before or after the marriage license was issued he obviously concealed it before the marriage from a good friend and concealed it from his bride after the marriage. There is no reason why he should have done this. Margaret Brown's testimony shows that she was willing to have George Brown for a suitor before he left Merenda Brown, and the proof made in her behalf shows that George Brown did not hesitate to disregard Merenda Brown whenever he wished. It was possible for Margaret Brown to know whether George Brown had filed a suit for divorce or for annulment of marriage with

Merenda Brown; and she testified unequivocally that there was no divorce. Her testimony as necessarily implies that there was no proceeding of any sort for dissolution of the relation between Merenda Brown and George Brown. Finally, it is to be remembered that George Brown was a workman, with limited means for maintaining litigation. Under all the circumstances of the case, it seems to us, as a matter of law, that George Brown tired of his relation with Merenda Brown, abandoned her, and subsequently married appellant Margaret Thomas without having instituted a proceeding so infrequent as one for annulment of marriage.

■ Points 3 and 4 assign error to the designation of the plaintiff in Special Issues 2 and 3, as Merenda *Brown*, the argument being that the trial court's use of "Brown" as part of Merenda's name was a comment on the evidence. There was some evidence that plaintiff was known as Merenda Jones or Merenda Miller instead of Merenda Brown. The petition filed by her designates her as "Merenda Brown, Plaintiff." The answer and cross action of appellant Margaret Brown also named the plaintiff as "Merenda Brown", as does the answer of the Insurer. Special Issue 2 inquired whether there was a common law marriage between George Brown "and the plaintiff, Merenda Brown." Special Issue 3 inquired whether George Brown "did not divorce the plaintiff, Merenda Brown." Points 3 and 4 are overruled. The form of Issues 2 and 3 does no more than adopt the name used by and for Merenda in the pleadings, and shows that this was done by referring to her as the "plaintiff." There was no likelihood that the jury would construe Issues 2 and 3 and expressing a comment on the conflict in the evidence concerning the name Merenda had been known by when she and George Brown were living together.

■ Point 5 assigns as error that Issue 2 was "a general charge and a general submission of several elements, all in one issue, and was actually a question of law for the court to determine after the jury had found the facts and that the issue as submitted took away the value of the Special Issue System." Point 5 is overruled. Issue 2, with its accompanying instruction, submitted the fundamental question of fact, that is, whether there was a marriage. This inquiry involved three evidentiary matters, namely, agreement between unmarried persons, their living together, and their holding themselves out to the public as husband and wife; and the instruction accompanying Issue 2 listed these matters. Describing this marriage as a "common law marriage" did not convert the question of fact, whether there was a marriage, into a question of law. The Issue is in a form often used. See: West's Texas Digest, Marriage, ■ Speer's "Special Issues", p. 752; Stayton's Texas Form Book, 4th Ed. Sec. 59. The nature of the fundamental question of fact and the form of the issue are somewhat like the special issues submitted in actions involving claim of title by adverse possession. See: Viduarri v. Bruni, Tex.Civ.App., 179 S.W.2d 818.

The judgment of the trial court is affirmed.