**H. B. ZACHRY COMPANY et al.,**
**Appellants,**

**v.**

**CECO STEEL PRODUCTS CORPORATION**
**et al., Appellees.**

**No. 4002.**

Court of Civil Appeals of Texas.

Eastland.

May 6, 1966.

Rehearing Denied June 10, 1966.

Butler, Binion, Rice, Cook & Knapp, Jack Binion and Fletcher Etheridge, Houston, for appellants.

Baker, Botts, Shepherd & Coates, Thomas M. Phillips and Robert J. Malinak, Barrow, Bland, Rehmet & Singleton, R. H. Wheless, Jr., Houston, for appellees.

GRISSOM, Chief Justice.

This suit arose out of the construction in 1960 and 1961 of twelve Atlas missile launching sites for the United States in a six county area surrounding Abilene. H. B. Zachry Company and Brown & Root, Inc., as joint venturers, hereinafter called Zachry-Brown, were the prime contractors under a written contract with the United States acting through its Corps of Engineers. Ceco Steel Products Corporation and G & N Corporation were subcontractors with agreements to furnish and place reinforcing steel under written contracts with Zachry-Brown, approved by the

government. Erection of these sites was a governmental crash program for launching international ballistic missiles, intended to speedily narrow the missile gap between the United States and Russia. Said prime and subcontractors initially suffered losses on the project. However, Zachry-Brown eventually collected from the United States more than $31,000,000.00 on its $20,000,000.00 contract. The difference in the amount agreed to be paid and the amount collected by Zachry-Brown is accounted for by the fact that the first interest of our government was to get the missile sites in operation as fast as possible. No pilot plants were built. The missiles were still being developed and improved while the missile launching sites were being constructed. All contractors were required to perform their work faster than was contemplated when their contracts were signed. Many changes in plans, schedules and work were required by the government while said contracts were being executed.

Stated tersely, this suit is mainly based upon the contention of subcontractors Ceco and G & N that when Zachry-Brown collected $2,463,312.49 from the United States upon completion of the contracts they collected for some losses by Ceco and G & N which they have not paid over to Ceco and G & N. Plaintiffs also sought to recover from Zachry-Brown damages for breach of their contract to furnish and maintain for appellees certain access roads and storage facilities, also, "retainage", money due plaintiffs under their subcontracts for labor and material furnished, plus interest and attorneys' fees.

No such missile launching sites had been built when contracts for construction of these twelve sites were made. In its contract with Zachry-Brown the government reserved the right to make changes in plans and specifications and to require other work. The government emphasized that time extensions would not be granted. The government attempted the simultaneous development of missiles, design and con-

struction of said bases and the training of crews. The stream of changes ordered by the government compelled said contractors to do their work differently, faster than planned and out of scheduled, orderly sequence. During construction, while all contractors here involved were losing money because of such changes, there was a Congressional investigation. It was recognized by an appropriate Congressional committee and the Corps of Engineers that such change orders, lack of completion of plans and designs, unusually adverse weather conditions and the like, were causing labor and material to cost said contractors much more than was contemplated when their contracts were signed.

During construction there were 117 changes ordered by the Corps of Engineers. They disrupted orderly execution of all contracts. Some of the changes could not have been anticipated by the contractors when they were estimating and bidding on their contracts. Some of the work was done under the most adverse weather conditions in the history of the area. The contractors were forced to assemble approximately twice as much equipment and to recruit about two and one-half times the number of employees reasonably estimated when their contracts were made. Ceco and G & N had reasonably planned to perform their subcontracts with experienced crews, to use the knowledge gained while working on the first group of three sites on later sites and to pay little overtime. These things increased the contractors' requirements for the number of employees far above the number of skilled workmen available and compelled them to use inexperienced men and to work as long as seventy hours per week. All contractors planned to work on three sites at a time. Because of the government's change orders they were required to furnish equipment and manpower sufficient to do the work on as many as nine sites at one time. Said subcontractors contemplated completion of their contracts in December, 1960. They were still working thereon in August,

1961. The contracts provided that the United States would pay the cost of acceleration and extra effort so required; that time extensions would not be granted, but the government would pay the contractors the losses they sustained which were not caused by their own fault.

At the Congressional hearing, the Chairman of the Appropriations Sub-Committee called for answers to certain questions. He said such contracts provided for allowing contractors extensions of time for excusable delays caused by matters beyond their control, such as unusual weather, acts of the government, and the like, but that the Corps of Engineers could not grant time extensions without approval of the Air Force. He asked, if time extensions were not granted, what should the government do about the contractors' increased costs. General Itschner, head of the Corps of Engineers, recognized such claims as proper and inquired how such claims could best be handled and the contractors paid therefor. How could the contractors substantiate their claims? The committee was informed that such contracts provided that if changes made by the government increased the expenses of contractors, or if conditions not chargeable to them caused losses by contractors, an equitable adjustment would be made with them by the government. It was stated that such losses were being caused by the increased expense of contractors resulting from government change orders, which required payment of an unexpected amount of overtime for labor, inefficiency of men working longer hours than expected and that the project would require contractors to furnish more equipment, more workmen and more pay more overtime and produce greater inefficiency than could have been anticipated when the contracts were signed. There was evidence that labor became more inefficient with every hour worked over 48 hours per week and by being required by the government rush orders to work in small areas where different groups interfered with each other; that when such required acceleration destroyed ability to benefit from experience, as, for example, the subcontractors proper plan to work on not more than three sites at a time was changed by the government requiring them to work on nine sites at one time; plans and schedules were interrupted and cost of performance of their contracts increased, having a devastating effect on the cost to contractors of equipment, material, labor and transportation. It was concluded that the interest of contractors and the government alike would be protected by negotiation of all equitable claims. The details of what must be furnished to substantiate a claim was to be decided on each claim by the contracting officer for the Corps of Engineers.

Ceco and G & N, being subcontractors under Zachry-Brown, had no contractual relationship with the United States. Neither could present directly to the government a claim for such losses. Zachry-Brown did have the right and the duty to assert any power claim for them. Zachry-Brown had the right and duty to assert the same claim for Ceco and G & N that they would have asserted for themselves had they elected to do the work done by Ceco and G & N and sustained their losses. Since G & N and Ceco could not submit a claim they were compelled to rely on Zachry-Brown to submit their claim for losses caused by the government and to collect same for them.

The case was submitted to a jury and answered substantially as follows:

### SPECIAL ISSUE NO. 1

Do you find from a preponderance of the evidence that G & N and Ceco in erecting the reinforcing steel on the construction project in question, sustained losses of the same character as those described by Zachry-Brown in its letters, dated October 23, 1961, and January 10, 1962, respectively, to the United States Government?

Answer: We do.

By the use of the term "losses of the same character as those described by Zachry-Brown in its letters, dated October 23, 1961, and January 10, 1962, respectively", there is meant those losses which are described as construction labor performed during unusually severe weather, acceleration in lieu of time extension and accleration of the placing of the reinforcing steel preparatory to concrete pour.

If you have answered Special Issue No. 1 We do, and only in that event, then answer:

## SPECIAL ISSUE NO. 2

Do you find from a preponderance of the evidence that the acceleration claims dated October 23, 1961, and January 10, 1962, which Zachry-Brown made against the United States Government, included said losses, if any, sustained by G & N and Ceco?

Answer: We do.

If you have answered Special Issue No. 2 We do, and only in that event, then answer:

## SPECIAL ISSUE NO. 3

Do you find from the evidence that Zachry-Brown collected from the United States Government a sum of money which included said losses, if any, sustained by G & N and Ceco?

Answer: We do.

If you have answered Special Issue No. 3 We do, and only in that event, then answer:

## SPECIAL ISSUE NO. 4

What sum of money, if any, do you find from a preponderance of the evidence that Zachry-Brown collected from the United States Government, if you have so found, for said losses, if any, sustained by G & N and Ceco?

Answer by stating the amount, if any, in dollars and cents.

Answer: $309,000.00.

If you have answered Special Issue No. 1 We do, and if you have also answered Special Issue No. 2 We do not and only in that event, then answer:

## SPECIAL ISSUE NO. 5

Do you find from a preponderance of the evidence that prior to the completion of the placing of the reinforcing steel, G & N and Ceco notified Zachry-Brown that they were sustaining such losses, if any?

Answer: —————

If you have answered Special Issue No. 5 We do, and only in that event, then answer:

## SPECIAL ISSUE NO. 6

Do you find from a preponderance of the evidence that following such notices to Zachry-Brown, if you have so found, Zachry-Brown represented to G & N and Ceco that Zachry-Brown would submit claim for such losses, of any, to the United States Government?

Answer: —————

If you have answered Special Issue No. 6 We do, and only in that event, then answer:

## SPECIAL ISSUE NO. 7

Do you find from a preponderance of the evidence that G & N and Ceco relied on such representation, if you have so found?

Answer: —————

If you have answered Special Issue No. 7 We do, and only in that event, then answer:

## SPECIAL ISSUE NO. 8

Do you find from a preponderance of the evidence that as a result of such re-

liance, if you have so found, G & N and Ceco failed to file their claim for such losses, if any, before October 30, 1961?

Answer: ——————

If you have answered Special Issue No. 8 We do, and only in that event, then answer:

## SPECIAL ISSUE NO. 9

Do you find from a preponderance of the evidence that Zachry-Brown was negligent in failing to submit to the United States Government the claim of G & N and Ceco for such losses, if any?

Answer: ——————

By the term "negligent" as used in this Special Issue is meant the failure to exercise that degree of care as would a person of ordinary prudence in the exercise of ordinary care under the same or similar circumstances.

If you have answered Special Issue No. 9 We do, and only in that event, then answer:

## SPECIAL ISSUE NO. 10

What sum of money, if any, do you find from a preponderance of the evidence was the amount of the loss, if any, sustained by G & N and Ceco as a result of such failure, if any, on the part of Zachry-Brown?

Answer: ——————

## SPECIAL ISSUE NO. 11

Do you find from a preponderance of the evidence that Zachry-Brown failed to furnish G & N access roads which were properly surfaced and maintained to the extent that they were usable during normal adverse weather conditions?

Answer: We do.

If you have answered Special Issue No. 11 We do, and only in that event, then answer:

## SPECIAL ISSUE NO. 12

What sum of money, if any, do you find from a preponderance of the evidence was the loss, if any, sustained by G & N as a direct result of the failure of Zachry-Brown to furnish G & N such properly surfaced and maintained access roads, if you have so found? Answer by stating the amount, if any, in dollars and cents.

Answer: $5,603.00

## SPECIAL ISSUE NO. 13

Do you find from a preponderance of the evidence that Zachry-Brown failed to furnish G & N storage areas for the reinforcing steel which were properly surfaced and maintained to the extent that they were usable during normal adverse weather conditions?

Answer: We do.

If you have answered Special Issue No. 13 We do, and only in that event, then answer:

## SPECIAL ISSUE NO. 14

What sum of money, if any, do you find from a preponderance of the evidence was the loss, if any, sustained by G & N as a direct result of the failure of Zachry-Brown to furnish G & N such properly surfaced and maintained storage areas, if you have so found?

Answer by stating the amount, if any, in dollars and cents.

Answer: $5,603.00.

## SPECIAL ISSUE NO. 15

Do you find from a preponderance of the evidence that the overhead bridges erected at the Oplin, Baird and Denton sites prior to G & N's placing the reinforcing steel therein unduly interfered with the work of G & N?

Answer: We do.

If you have answered Special Issue No. 15 We do, and only in that event, then answer:

## SPECIAL ISSUE NO. 16

Do you find from a preponderance of the evidence that by erecting the overhead bridge at the Oplin, Baird and Denton sites prior to G & N's placing the reinforcing steel therein, Zachry-Brown failed to coordinate its work with that of G & N, in order to avoid undue interference with the work of G & N, if you have so found?

Answer: We do.

If you have answered Special Issue No. 16 We do, and only in that event, then answer:

## SPECIAL ISSUE NO. 17

What sum of money, if any, do you find from a preponderance of the evidence was the loss sustained by G & N, if any, as a direct result of the erection by Zachry-Brown of the overhead bridges at the Oplin, Baird and Denton sites prior to G & N's placing their reinforcing steel therein?

Answer by stating the amount, if any, in dollars and cents.

Answer: $28,777.00.

## SPECIAL ISSUE NO. 18

Do you find from a preponderance of the evidence that while G & N was performing its work in the silos, its work was unduly interfered with by the crews of Zachry-Brown who were also working in the silos?

Answer: We do.

If you have answered Special Issue No. 18 We do, and only in that event, then answer:

## SPECIAL ISSUE NO. 19

Do you find from a preponderance of the evidence that Zachry-Brown failed to coordinate its work with the work of G & N in the silos in order to avoid undue interference with the work of G & N in erecting the steel in the silos, if you have so found?

Answer: We do.

If you have answered Special Issue No. 19 We do, and only in that event, then answer:

## SPECIAL ISSUE NO. 20

What sum of money, if any, do you find from a preponderance of the evidence was the loss sustained by G & N, if any, as a direct result of the failure of Zachry-Brown to coordinate the work of G & N in the silos in order to avoid undue interference with the work of G & N in erecting the steel in the silos, if you have so found?

Answer by stating the amount, if any, in dollars, and cents.

Answer: $14,022.84.

## SPECIAL ISSUE NO. 21

Do you find from a preponderance of the evidence that reinforcing steel shipped to the job by Ceco for installation in the silos, launch control centers and appurtenant structures was used by Zachry-Brown for other purposes?

Answer: We do.

If you have answered Special Issue No. 21 We do, and only in that event, then answer:

## SPECIAL ISSUE NO. 22

What amount of such reinforcing steel, if any, do you find from a preponderance of the evidence that Zachry-Brown used for such other purposes, if any?

Answer by stating the amount in tons and/or fraction thereof, if any.

Answer: 41 tons.

If you have answered Special Issue No. 22 We do, and only in that event, then answer:

## SPECIAL ISSUE NO. 23

What sum of money, if any, do you find from a preponderance of the evidence represents the market value, at Abilene, Texas, in the month of August, 1960, of such steel, if any, as was used by Zachry-Brown for such other purposes?

Answer by stating the market value per ton, if any, in dollars and cents.

Answer: $126.00

By the term "market value", as used in the foregoing Special Issue is meant that sum of money per ton of steel which a person who was willing but not compelled to buy would pay, if buying such steel from a person who is willing but not compelled to sell.

## SPECIAL ISSUE NO. 24

Do you find from a preponderance of the evidence that prior to the construction of the caps in the silos, Zachry-Brown represented to Ceco that a parapet wall would not be poured before the placing of the reinforcing steel?

Answer: We do.

If you have answered Special Issue No. 24 We do, and only in that event, then answer:

## SPECIAL ISSUE NO. 25

Do you find from a preponderance of the evidence that Ceco relied on such representation, if you have so found?

Answer: We do.

If you have answered Special Issue No. 25 We do, and only in that event, then answer:

## SPECIAL ISSUE NO. 26

Do you find from a preponderance of the evidence that in reliance upon such representation, if you have so found, Ceco ordered extra reinforcing steel in order to avoid the necessity of butt welding?

Answer: We do.

If you have answered Special Issue No. 26 We do, and only in that event, then answer:

## SPECIAL ISSUE NO. 27

Do you find from a preponderance of the evidence that after Ceco ordered such extra steel, if you have so found, Zachry-Brown poured the parapet wall in the cap prior to the placing of the reinforcing steel?

Answer: We do.

If you have answered Special Issue No. 27 We do, and only in that event, then answer:

## SPECIAL ISSUE NO. 28

Do you find from a preponderance of the evidence that Ceco sustained losses as a result of Zachry-Brown's pouring the parapet wall in the silo cap prior to the placing of the reinforcing steel, if you have so found?

Answer: We do.

If you have answered Special Issue No. 28 We do, and only in that event, then answer:

## SPECIAL ISSUE NO. 29

What sum of money, if any, do you find from a preponderance of the evidence was the loss sustained by Ceco, if any, as a direct result of Zachry-Brown's pouring the parapet wall prior to the placing of the reinforcing steel, if you have so found?

Answer by stating the amount, if any, in dollars and cents.

Answer: $20,916.00.

## SPECIAL ISSUE NO. 30

Do you find from a preponderance of the evidence that Zachry-Brown so changed its schedules for the erection of the reinforcing steel that the erection thereof by G & N and Ceco was substantially different from those schedules originally contemplated by the parties when they made their agreements in August, 1960?

Answer: We do.

If you have answered Special Issue No. 30 We do, and only in that event, then answer:

## SPECIAL ISSUE NO. 31

Do you find from a preponderance of the evidence that as a direct result of such damages, if any, there was an abandonment by the parties of their agreements in August of 1960 concerning the erection of the reinforcing steel?

Answer: We do.

By the term "abandonment", as used in the foregoing Special Issue is meant an agreement between the parties, which may be express or implied, from the actions of the parties, to disregard their previously existing contractual relationship and substitute in lieu thereof another and different agreement.

If you have answered Special Issue No. 31 We do, and only in that event, then answer:

## SPECIAL ISSUE NO. 32

Do you find from a preponderance of the evidence that Zachry-Brown received and accepted benefits from G & N and Ceco in their work of erecting the steel under the changed schedules, if you have so found?

Answer: We do.

## SPECIAL ISSUE NO. 33

What sum of money, if any, do you find from a preponderance of the evidence is the reasonable value of the work and services performed by G & N and Ceco in the erection of the reinforcing steel in the missile sites?

Answer by stating the amount, if any, in dollars and cents.

Answer: $919,818.40.

## SPECIAL ISSUE NO. 34

What sum of money, if any, do you find from a preponderance of the evidence that Zachry-Brown has withheld from G & N for the work performed by G & N in erecting the reinforcing steel in the missile sites?

Answer by stating the amount, if any, in dollars and cents.

Answer: $25,036.00.

## SPECIAL ISSUE NO. 35

What sum of money, if any, do you find from a preponderance of the evidence that Zachry-Brown has withheld from Ceco for the furnishing by Ceco of reinforcing steel for the construction of the missile sites?

Answer by stating the amount, if any, in dollars and cents.

Answer: $88,403.30.

## SPECIAL ISSUE NO. 36

Do you find from a preponderance of the evidence that the working conditions and schedules were so different from those contemplated by the parties that Ben Dodson, doing business as General Steel Erection Company, the subcontractor for Ceco, could not perform his work in placing the reinforcing steel?

Answer: We do.

If you have answered Special Issue No. 36 We do, and only in that event, then answer:

## SPECIAL ISSUE NO. 37

Do you find from a preponderance of the evidence that as a direct result of the

different working conditions and schedules Ben Dodson, doing business as General Steel Erection Company, abandoned the work?

Answer: We do.

If you have answered Special Issue No. 37 We do, and only in that event, then answer:

## SPECIAL ISSUE NO. 38

Do you find from a preponderance of the evidence that Ceco sustained damages as a direct result of Ben Dodson's abandoning the work in placing the reinforcing steel?

Answer: We do.

If you have answered Special Issue No. 38 We do, and only in that event, then answer:

## SPECIAL ISSUE NO. 39

What sum of money, if any, do you find from a preponderance of the evidence was the amount of the damages, if any, sustained by Ceco as a direct result of Ben Dodson's abandoning the work?

Answer by stating the amount, if any, in dollars and cents.

Answer: $26,300.00.

If you have answered Special Issue No. 21 We do, and only in that event, then answer:

## SPECIAL ISSUE NO. 40

Do you find from a preponderance of the evidence that Ceco waived any charge for such reinforcing steel shipped to replace shortages?

Answer: We do not.

By the term "waived", as used in the foregoing Special Issue is meant the intentional relinquishment of a known right.

Judgment was rendered for Ceco and G & N, jointly and severally, against H. B. Zachry Company and Brown & Root, Inc., for $260,673.00, instead of the $309,000.00 found in answer to issue 4 to have been collected from the government by Zachry-Brown for Ceco and G & N, the court having required a remittitur of the difference. Interest at 6% was awarded on the $260,673.00 from February 23, 1962, the date the United States was found to have paid it to Zachry-Brown for appellees. The court rendered judgment for G & N against Zachry-Brown for $36,242.-00. That was the aggregate of damages found in answer to issues 12, 14 and 34, less remittiturs aggregating $1350.58. Judgment was rendered for Ceco against Zachry-Brown for $88,403.30, "retainage." Interest was awarded on the last two amounts at 6% from February 23, 1962. Plaintiffs were also awarded $30,000.00 attorneys' fees for prosecuting their claims for labor and material, amounting to $88,-403.30, which was, admittedly, owed appellees for labor and material furnished, but retained by appellants. As shown in answer to issue 4, the jury found that Zachry-Brown collected $309,000.00 for losses sustained by G & N and Ceco. The court required a reduction to $260,673.00. Such remittitur was filed. Zachry-Brown filed a cross action against Ceco. The court adjudged that they take nothing by said cross action. Zachry-Brown have appealed.

■ Appellants' first 4 points present the contention that the court erred in rendering judgment for appellees on the answers to issues 1 to 4 inclusive because (1) there is no evidence to support said findings; (2) the evidence is insufficient; (3) the answers to issues 2, 3 and 4 are so against the great weight and preponderance of the evidence as to be manifestly wrong and unjust and (4) contrary to the evidence, in that, the evidence shows appellants did not include any of appellees' losses in the claim they submitted to the

government and did not collect any of appellees' losses.

Appellants admit they submitted to the government a claim for losses amounting to more than $5,000,000.00 by a letter, dated October 23, 1961, addressed to the Corps of Engineers. That claim was not paid. Thereafter Mr. Zachry, President of H. B. Zachry Company, negotiated settlement of an amended claim. The amended claim was submitted by Zachry-Brown to the government by letter dated January 10, 1962. By a change order dated February 23, 1962, Zachry-Brown's amended claim was allowed in part and it was paid $2,463,312.49. Zachry-Brown contend they did not present a claim which included any of appellees' losses nor collect any money for appellees' losses. Appellees presented their second claim, a formal written claim to appellants in October, 1961. They requested appellants to submit their claim to the government. Appellants say they refused to submit appellees' claim. Appellees assert that at the time appellants refused to submit their claim dated October 30, 1961, appellants purposely left the impression with appellees that they were not submitting any claim to the government for losses, were accepting their own losses, and advised appellees to go and do likewise; that, in fact, appellants, just a week previously, had submitted a claim to the United States for more than $5,000,000.00 for such losses by appellees and appellants, which was paid in part in January 1962 and that the amounts awarded appellees as being collected by appellants for appellees were collected by appellants for appellees' losses and kept by appellants.

Appellants contend their claims show they presented no claim for losses by said subcontractors. Appellants say the first paragraph of their claim of October 23, 1961, shows they were presenting only their own claim for $5,448.075.00, for their own losses; that it excluded appellees' losses, "because appellants had not then

had to pay any of appellees' losses." The second paragraph of the claims presented by Zachry-Brown for losses caused by the increased cost of acceleration by government change orders stated that "all items of project cost were affected by the result of the many change orders that were issued. The least affected items being overhead and subcontractors; however, these items were materially affected." Appellants argue that their statement that the cost of all items of the original project were affected and that subcontractors were materially affected thereby do not support a conclusion that appellants were representing to the government that Ceco and G & N were so affected, or justify a finding that said claims included any of appellees' losses. Appellants say their statements that the cost of all items of the "entire project" were thus increased; that unusually severe weather affected efficiency on the "entire project" and that the government's many change orders required acceleration of all items of work provided for in the original contract and that subcontractors' expenses were thereby materially affected refer only to appellants, not to the appellees' increased expenses. That, since the breakdown of the claims state only the change order numbers and the estimated additional expense of acceleration, without stating whose employees or equipment were thus affected, no inference may be drawn that appellees' losses were included in the claims presented by Zachry-Brown. (It may be of no great significance, but we understand that some early small claims of appellees were presented by appellees to appellants, collected by appellants from the government and paid over to appellees.) Appellants say the fourth category in the breakdown of the claims they presented is for acceleration of concrete; that under it there is listed equipment and operators which have no connection with appellees and, necessarily, excludes them; that the admitted necessity of appellees placing reinforcing steel before concrete could be poured

by appellants is not material in determining the sufficiency of evidence to support the conclusion that the claims included any of appellees' losses. Appellants say the terms of the claims do not include any of appellees' losses and there is no evidence they did.

Appellants point out that their first claim, dated October 23, 1961, was not granted; that Mr. Zachry negotiated settlement of an amended claim filed January 10, 1962. The amended claim was for $3,240,553.74, $2,000,000.00 less than the claim filed on October 23, 1961. Appellants' second claim letter is divided into two parts. The first sets out the factors giving rise to and supporting the claim for increased expenses and is substantially the same as the first part of the first claim letter. Appellants say the difference is that in the first part of the amended claim there is added, as additional cost, the failure of the Corps of Engineers to timely approve revisions in original progress schedules, and that this has no bearing on the kind of losses described in issue one, or whether appellees' losses were included in the amount collected by appellants. The second part of the amended claim is for loss caused by unusually severe weather. It contains a list of additional supervisory personnel, workers and equipment required as a result thereof. Appellants say it excludes appellees' machinery and employees, except reinforcing ironworkers, for which a loss of only $2,179.43 was claimed. The claim asserted construction workers were affected by such weather. Appellants say this excludes appellees, except ironworkers, for which only $14,755.21 was claimed, and crane operators, for which only $21,008.28 was claimed. Appellants say the total claimed for increased cost due to unusually severe weather for ironworkers and crane operators is only $37,962.92, and that this was for appellants' employees and equipment.

Appellants contend their original claim for increases in general overhead expenses due to change orders and acceleration of work was eliminated when the claim was reduced by $2,208,521.00, and that not all of the amended claim was paid. Appellants admit that when they submitted the amended claim on January 10, 1962, they had already seen one claim prepared by appellees and had received and then had in their possession appellees' formal written claim dated October 30, 1961, which was presented to appellants within the time and in the manner requested by appellants. But, they say the claim submitted to the government does not show that it included any of appellees' losses and before it was presented appellees had requested Mr. Zachry to submit their claim and he had refused to do so.

By change order[1] no. 117, the United States approved the amended claim of January 10, 1962, to the extent of $2,463,312.49. The $2,463,312.49 was paid to appellants expressly for increased construction effort for, among other things, concrete. Appellants say the amount paid was not broken down, no separate amount was allowed for any item but there was a lump sum awarded for the stated causes. Therefore, appellants say, the government's change order 117 does not tend to prove that appellants collected any money for appellees' losses or, if so, how much; that three of the items paid for were not covered by issue one; that "concrete" losses paid for did not include any loss of appellees, but, if so, there was no showing of how much was collected for appellees' "concrete" losses; that by allowing appellants' claim for 4 items, the government rejected all others, so they become immaterial in considering the question whether appellants collected money for appellees' losses and, if so, how much.

Appellants say paragraph 3 of its contract with the United States required all claims to be in writing; that clause 4 required the contractor to notify the government of any changed physical conditions discovered in order to recover on any claim therefor and that any adjustment of the contract price for changed

conditions had to be in writing; that clause 5(c) required the contractor to notify the government in writing of any excusable delays to obtain an adjustment and clause 6 required that any decision of the government or any dispute between it and the contractor be in writing. Appellants conclude that appellees have not shown that the government waived any of these provisions and, unless appellees' losses were included in the claim presented by appellants and allowed by change order 117, no payment by the government for any of appellees' losses has been, or can be, shown.

It is undisputed that Ceco and G & N sustained losses caused by some of the same things and of the same character as those claimed and collected for by Zachry-Brown. But, appellants insist, the evidence does not sustain the findings that appellees' losses were included in appellants' claim; that Zachry-Brown collected money for appellees' losses, or, if so, that they collected for appellees the amount for which they obtained judgment. Appellants say the record shows appellees never asked appellants whether the claims they presented included any of appellees' losses; that Zachry was not asked whether appellants' claim included any of appellees' losses; that Strange, appellants' assistant project manager who had charge of claims against the government and signed the claims, was not asked whether appellees' losses were included; that the nearest appellees came to asking any of appellants' officials whether appellees' losses were included was when Steubing was asked whether he knew Strange made claims dated October 23, 1961 and January 10, 1962, wherein he claimed more than one-half million dollars for acceleration of concrete. He was then asked whether there could be an acceleration of concrete without acceleration of furnishing and placing reinforcing steel, appellees' job, and he answered, "no". Appellees point out that Nichols, President of G & N, testified that in the Fall of 1961 he talked with Zachry about appellants submitting appellees' claim;

that Grogan, Vice President of Ceco, talked with Zachry concerning appellees' losses; that, shortly before the United States paid appellants, Zachry told Nichols he was sorry the project had turned out bad for G & N but that it was worse for appellants and they were not presenting a claim for their losses and suggested that G & N do likewise. Appellees point to the fact that H. B. Zachry testified that appellants were paid $30,741,732.12, although the original contract price was $20,075,000.00, that is, Zachry-Brown received $10,000,000.00 more than its contract called for; that Zachry testified that appellants' October 1961 claim was superseded by their amended, January 10, 1962, claim for loss caused by acceleration of work under the original contract of $1,311,941.00, and that such items of work included placing the reinforcing steel, appellees' job. Mr. Zachry personally negotiated the settlement; he testified appellants usually forwarded the claims of their subcontractors to the government. Mr. Zachry admitted that he talked to appellees several times about compiling and presenting their claim and told them that, if they had a claim, "to get it in;" that, after he had told appellees that the first claim they showed him was insufficient, he offered to help them compile a proper claim and told them to send a certain employee of appellees to a certain official of appellants at Abilene, who would furnish the necessary information; that, if appellants did not "forward" appellees' claim to the government, it was because appellees' claim was not in proper form. Appellees discuss the testimony of Mr. Grogan, Vice President of Ceco, that his communications with appellants concerning appellants making a claim for appellees started in November 1960, that he had conversations and communications with Moore, appellants' manager on this project, Johnson, Vice President and General Counsel for H. B. Zachry Company, and H. B. Zachry concerning appellants presenting a claim for appellees; that he was advised by appellants that facts which might sup-

port a claim for appellees were being investigated by appellants; that appellees' right to file a claim was being fully protected by appellants but that it would be better for appellees to delay preparing a claim until all facts were known, at the end of the job; that, in September 1961, he discussed presenting a claim for Ceco and G & N with Mr. Zachry and Mr. Johnson; that Grogan then delivered to Zachry some work sheets, not amounting to a formal claim but showing appellees' losses; that Zachry took a quick look at them and said they did not form a basis for a claim and he didn't believe appellees had one. But, Mr. Zachry then said that if appellees would get their claim in proper form he would submit it to the government; that appellants would assist in obtaining information necessary for such a claim and Zachry advised him to send Mr. Alexander of Ceco to Abilene to get such information from certain representatives of Zachry-Brown; that Mr. Alexander went to Abilene, as so suggested, but was generally rebuffed; that appellees finally employed lawyers to prepare their formal claim letter of October 30, 1961; that, before sending it to appellants, Grogan talked with Mr. Johnson and informed him that Ceco and G & N were preparing that claim and Johnson told them that they should hurry because appellants were meeting soon with the Corps of Engineers to discuss their claim and appellees should forward their claim to appellants in October, which appellees did; that Grogan made an appointment with and met with H. B. Zachry on December 18, 1961, along with other officials of appellants and appellees; that appellees again requested appellants to present their claim; that Zachry then refused to do so, saying he did not think they had a claim, but, regardless of that, appellants had already "signed off" with the government and it was too late for them to submit appellees' claim, leaving the impression that appellants had not and were not going to present a claim for themselves or anyone else. Grogan testified that he consulted counsel and had a talk with the Corps of Engineers about appellees' claim but the Corps told him it could not discuss appellees' claim because that had to be presented through Zachry-Brown, with whom alone the government had a contract. Appellants contend it is conclusively shown appellees were informed by the government, subsequent to December 18, 1961, that appellants had not presented a claim for any of appellees' losses. They reassert there was no evidence appellants included any of appellees' losses in the claims they presented or that appellants collected any money for appellees' losses; that, on the contrary, appellants have shown that they did not present any claim for appellees' losses or collect any money for them; wherefore, appellants say, the judgment for $260,673.00, based upon the answers to issues 1, 2, 3 and 4 should be reversed and judgment rendered for appellants. (The jury found in answer to those issues that appellants collected $309,000.00 for appellees. The court required a remittitur, leaving a judgment for $260,673.00 for appellees' losses found to have been collected and kept by appellants.)

Ceco and G & N contend that there is not only some evidence, but ample evidence, to sustain the answers to issues 1, 2, 3 and 4 and the judgment based thereon, as reduced by remittitur and that Zachry-Brown submitted and collected for appellees' losses as much as appellees recovered therefor. In the beginning of negotiations with appellants, Ceco was primarily concerned with selling appellants the reinforcing steel. Zachry-Brown wanted to contract for such steel erected at the sites. Ceco contracted with appellants to both furnish and place the reinforcing steel. Ceco subcontracted its erection to Dodson. Ceco placed rush orders for steel for the first three sites, it being then understood that Dodson would begin placing steel at the first three sites about July 18, 1960. Appellants' contract with Ceco was executed July 28, 1960, but, because of the national emergency, work was actually begun before its execution. Early in their dealings, there was confusion

and loss. On July 17, 1960, Morris, for appellants, pointed out that the jobs were already $10,000.00 per site "in the hole." He instructed Moore, appellants' manager for the project, that, except in extreme emergencies, there would be no more overtime paid. Appellants said they were then already a month behind, notwithstanding the extra money spent for overtime. Mr. Dodson went broke and abandoned the project about August 24, 1960. G & N conferred with appellants' Mr. Morris about erecting the reinforcing steel and Morris outlined the schedules and plans for its erection. Being assured how the steel was to be placed and what labor and equipment would be required, G & N made a subcontract to place the reinforcing steel for $45.00 per ton. G & N promptly went to work. The government inspector noted that it had an excellent crew, fast and exact. Zachry-Brown government schedules provided the basis upon which G & N agreed to place the reinforcing steel and upon which G & N could reasonably anticipate labor and equipment requirements substantially as follows: (a) G & N's work was to be done on not more than three sites at one time, thus permitting men with the knowledge and experience gained on prior sites to use that knowledge and. experience on subsequent sites and avoid spreading men and equipment over the six counties in which the twelve launching sites were to be built and (b) to pay little overtime. Such, in effect, was written into the subcontracts of appellees who, incidentally, became joint venturers. Soon after G & N went on the job it became apparent that appellants were not following said schedules. Having reasonably anticipated using less than 100 men and 6 cranes at one time, G & N was required to employ more than 200 men and use more than twice the equipment planned to be used at one time and, instead of working on not more than three sites at once, appellees were required to work on nine sites simultaneously. Such problems and incident losses were added to during parts of 1960 and 1961 by appellees having to

work in the worst weather known in that area. In October 1960, G & N told Zachry-Brown it was suffering heavy losses. Appellants, through Moore, admitted they knew this and told appellees that appellants were sustaining larger losses from the same causes. As early as November 1960, Mr. Grogan, for appellees, started arrangements for Zachry-Brown to prepare and present their claim and collect their losses from the United States. Grogan talked with appellants' Mr. Moore about the matter. Appellants were informed in October 1960 that G & N had already sustained a loss of about $60,000.00. Appellants were told the facts showing that appellees' losses were caused by matters beyond their control and that equitable adjustment thereof should be made with the government by Zachry-Brown. Moore, for appellants, assured appellees they were fully protecting their right to file a claim. Moore suggested that Grogan see and complete arrangements for collecting their claim for losses through other officials of Zachry-Brown. He referred appellees to Mr. Johnson, Vice President and General Counsel for H. B. Zachry Company. Grogan immediately did that. In December 1960, Grogan and Johnson had a meeting, which was also attended by Mr. Zachry. Grogan was there assured that appellees' right to file a claim was being fully protected by appellants and that Zachry had already started an investigation to determine what could be claimed. Grogan was assured by appellants that he would be kept informed about filing a claim for appellees. Grogan wrote Johnson on December 6, 1960, that it was understood appellants would proceed with an investigation and determine whether or not a sound basis could be found for asserting excusable delay for appellees.

The real question then in the minds of all parties appeared to be how to collect the losses sustained by reason of the things mentioned. In February 1961, Grogan wrote Johnson that the head of the Corps of Engineers appeared to be genuinely sympathetic with them and amazed at the large

losses being sustained by contractors in constructing the missile sites and that a Congressional hearing was about to be held. General Itschner, head of the Corps of Engineers, stated the government's position as to payment of such losses. The basis and legitimacy of such claims were recognized by the United States. General Itschner said the government would pay claims for losses due to overtime; inefficiency caused by working long hours, congestion by many contractors working at the same place at the same time, abnormal weather and all acceleration of work caused by government change orders. Grogan called Johnson's attention to said statements, saying General Itschner had exactly described the losses appellees were sustaining. Johnson replied that he had a copy of the Congressional hearing and General Itschner's statements. The question then arose as to when a claim should be presented. After conversations between the parties hereto, it was determined, at the suggestion of appellants, to wait until the end of the job because they would then be in a better position to establish their losses. Zachry-Brown agreed to see that the rights of all parties to present claims were protected. Mr. Strange, delegated by appellants to deal with the government on claims and adjustments, repeatedly wrote the government that the whole job, including that of placing the reinforcing steel, was being excusably delayed, for which the parties hereto were not being given any relief. Strange made direct reference to appellees' work. On November 25, 1960, Strange wrote the Corps of Engineers referring to excusable delays that justified time extensions, described how unusually adverse weather affected appellees' work in placing the reinforcing steel, stating that heavy rains had caused muddy conditions which made it too hazardous to handle the heavy reinforcing bars to be placed by appellees and that this work could not be done until heavy equipment could be moved in to "muck out" the mud in the open cut, stating that rains had caused a delay of at least four days. The record justifies the conclusion that the necessity of appellees' workmen placing the reinforcing steel in the crowded areas, out of planned orderly schedule, exposed to rain, cold and wind made their work hazardous, difficult, slow and much more expensive than could have been reasonably anticipated when the subcontracts were made. In April 1961, appellants' Mr. Strange wrote the Corps of Engineers that the many change orders issued by the government had greatly affected schedules and expenses and entitled them to a finding of excusable delay which, if then granted, would be inadequate to compensate the contractors and they expected to be paid for the additional expenses caused by the government's acceleration of the entire project, including expenses incurred by added effort and orders changing plans and schedules. There was testimony that Strange began formulating a claim for increased expenses for the whole project in April, 1961, caused by acceleration of the whole project; that the many change orders had adversely affected the cost to contractors on the entire project and, specifically, that the resulting loss of efficiency had adversely affected the entire project.

As the end of the contract approached, in October 1961, Johnson and Grogan were again attempting to decide how best to prepare a claim for losses on the entire job. Johnson said appellants planned a conference with the government soon and requested Grogan to give him whatever claim for appellees he had assembled to substantiate appellees' claim. On October 30, 1961, appellees' claim letter, outlining the nature and extent of appellees' losses, as they could then best be determined, was given by appellees to Mr. Johnson, Vice President and General Counsel for Zachry Company, so that appellants could present appellees' claim and collect appellees' losses. This claim was given to appellants by appellees within the time suggested by appellants. Mr. Johnson never repudiated his agreement that appellees'

claim would be presented by appellants. Johnson did not ask for a formal claim from appellees. Under the contracts, none was required in order that appellees' claims might be included in the claim appellants presented to the United States. Strange, for appellants, had previously noted appellees' losses incurred in placing the reinforcing steel. On October 23, 1961, while Johnson and Grogan were discussing preparation of a claim for appellees' losses, so they might be collected by appellants, Strange presented a lengthy claim letter to the government asking reimbursement for losses, including some of the kind heretofore mentioned as being suffered by all parties hereto, exceeding five million dollars. Appellants stated therein that the cost of all items of the project had been increased by the government's many change orders, including the expenses of the subcontractors, who were materially affected thereby. Appellants listed increased cost of labor and equipment as among the adverse effects of the government's change orders, which required acceleration of all work. Appellants' claim for more than five million dollars was presented, in an all encompassing letter, upon completion of the job. It was intended to finish said business with the United States. In that claim appellants made particular reference to losses suffered by subcontractors.

The jury had a right to believe that appellants would not have made such statements had they not intended for the government to take into account and include the losses of appellees in paying the claim presented. Strange testified that he regarded the appellee subcontractors as employees of Zachry-Brown when he called the government's attention to their losses and stated that all items of the project were adversely affected by changes in plans and schedules required by the government. Appellants knew, among other reasons, because their contracts so provided, that appellees could not present their claim to the government and that appellees could be paid for their losses only through ap-

pellants. At the time the claims were prepared, presented and collected, in part, by appellants, they knew of General Itschner's position and the government's sympathetic attitude towards the losses of all contractors caused by increased overtime pay, excessive hours of work, congestion, adverse weather, departure from a planned, orderly schedule, and the like, which affected the expenses of appellees and appellants alike. When appellants presented the claims they knew appellees had suffered losses from the same causes appellants had.

After appellants received appellees' claim of October 30, 1961, and while they had it in their possession, without mentioning the matter to appellees, appellants filed an amended claim dated January 10, 1962, in which claim letter Strange made the same statements to the government with reference to losses having been suffered by contractors on the entire job and that subcontractors had been materially affected that had been made in appellants' first claim letter. Before appellants presented any claim to the government they knew of appellees' claim; that appellees expected them to present a claim for their losses and collect them and Zachry had seen such a claim in writing. Strange testified that G & N was one of the companies included in his statement that the cost of all items of the contract had been materially increased; that placing reinforcing steel was integrated with pouring concrete; that reinforcing steel had to be placed before concrete could be poured; that the largest item in the claim collected was for acceleration of items of work in the original contract, which was for more than $1,300,000.00; that one of the original contract items of work referred to was placing reinforcing steel, done by appellees, whose costs he stated, were materially affected by the government's change orders. Mr. Morris, an official of appellants, testified that the original contract items of work affected included placing reinforcing steel. We conclude that the record shows that appel-

lees and appellants sustained some of the same kind of losses from the same causes; that the jury had ample evidence to sustain the findings that the claim presented and collected by appellants included some of appellees' losses. We must now determine whether the record sustains the finding of the amount collected for appellees by appellants, less the amount remitted.

In February 1962, as shown by government records, the government paid appellants a lump sum, without itemization, of $2,463,312.49 for losses asserted in the claim presented by appellants. Appellants' agreement with the government shows on its face that it included payment on the largest claim, to-wit, for "increased construction effort for concrete." Appellants' witnesses and others testified in effect that there could be no increased construction effort for concrete without like increased construction effort for reinforcing steel imbedded in the concrete; that placing the reinforcing steel was an essential part of the concrete work and the increased effort in placing said steel was a part of the "increased construction effort for concrete." Appellees would place the reinforcing steel and appellants would then pour the concrete over it. There was evidence to the effect that the only increased construction effort for concrete related to the reinforcing steel, except that steel could be placed and concrete poured over it at more sites at one time and that was the only way concrete could be accelerated. Mr. Steubling, one of appellants' superintendents, said there was nothing unusual in Zachry-Brown's pouring of concrete and that acceleration of concrete related primarily to the preliminary work of placing the reinforcing steel.

It is not of great import that in presenting claims appellants used such language as "our" losses, since Zachry-Brown was responsible to the United States for all the work, was appellees' spokesman with the United States under all contracts and was the only one that could present, negotiate or collect a claim against the government for appellees. Appellants had the exclusive right and duty to collect appellees' losses caused by the government's change orders. It was not inconsistent, even under appellees' theory, for the claims to refer to appellees' and appellants' losses as "our" losses. With reference to the claim for losses sustained by appellees, the government would not negotiate with appellees because only appellants had a contract with the government and only appellants had a right to collect such claims. Furthermore, appellants did not choose to submit to the government the written claims handed to appellants by appellees. Under the circumstances, it is understandable that the Corps of Engineers confined its negotiations with reference to such losses to appellants and had a right to think appellees' losses were included and being paid for. We conclude there was ample evidence that appellants and appellees suffered the same type of losses from the same causes and that appellants included appellees' losses and collected therefor.

The only remaining question relative to the answers to issues 1, 2, 3 and 4 and appellants' first four points is whether the evidence sustains the finding of the amount collected for appellees, less the remittitur filed. The original claim asked for $5,448,075.00 for additional expenses caused by the government's change orders causing acceleration of the entire project. It stated specifically that the cost of all items of the project was increased by the government's actions and that the cost of work done by subcontractors was materially increased; that labor and equipment were among the things which bore the brunt of increased expenditures required by government acceleration; that contractors were forced to enlarge crews and equipment, to work seven days per week, ten to twelve hours per day, "around the clock"; that such acceleration decreased the efficiency of labor and equipment; that during certain periods their costs were materially increased by unusually severe weather which affected all work and decreased efficiency throughout the entire project and that the only way to overcome the delays occasioned thereby was

to accelerate all labor and equipment and, necessarily, the cost thereof. The evidence justified a conclusion that the increased construction effort for concrete included increased construction effort for reinforcing steel and was a part of the large loss claimed and paid for. The claims stated that changes required by the government increased the contractors' expenses for all items of the original contract. Appellees' job was a part thereof. The claim asserted increased cost for "acceleration of concrete" of $590,972.00. Appellants say this was only for their losses. Appellees say it included theirs. The government paid part of that claim on January 10, 1962. This claim was presented after Mr. Zachry had seen appellees' original claim and after appellees, in conformity with appellants' suggestion and with appellants' help, had prepared a formal claim and delivered it to Zachry-Brown within the time requested by appellants. Like the original claim, the amended claim presented by Zachry-Brown in January 1962, and paid in part, in a lump sum, without explanation of what or how much was being paid for any item, included a claim for increased expenses caused by revisions of all original project items, including a large amount for acceleration of concrete, which, the evidence justifies the conclusion, included appellees' claim for acceleration of steel. Zachry-Brown therein reiterated the statement made in its first claim that the cost of all items of the project were increased by many changes required by the government, including the cost to subcontractors, who were materially affected thereby; it stated that the cost of labor and equipment bore the brunt of increased expenditures; that the change orders required a build-up of labor crews and equipment, longer working hours and caused a loss of efficiency; that unusually severe weather affected all the work and had a marked effect on efficiency on the entire project; that the only way to overcome the delays caused thereby was to accelerate the entire labor and equipment set up. The claim included a loss of $590,-971.00 caused by acceleration of concrete

required by government change orders. Previous remarks to the effect that there was evidence that furnishing and placing reinforcing steel was a necessary and integral part of concrete pouring is applicable here. On this amended claim the government paid Zachry-Brown $2,463,312.49, all of which they kept. The record supports the conclusion that a substantial portion thereof was paid for appellees' losses. How much cannot be demonstrated with mathematical certainty. That is not required. Hindman v. Texas Lime Company, 157 Tex. 592, 305 S.W.2d 947, 952. In Southwest Battery Corp. v. Owen et al., 131 Tex. 423, 115 S.W.2d 1097, 1099, our Supreme Court said that courts draw a distinction between the necessity for proof of legal damage and proof of the amount thereof and, while uncertainty as to existence of legal damages is fatal to recovery, uncertainty as to the amount is not. In South Chester Tube Co. v. Texhoma Oil & Refining Co., Tex.Civ.App., 264 S.W. 108, 111, (Writ Dis.), the court said:

"The rule as to uncertainty relates to uncertainty as to cause, and not as to uncertainty of measure of extent. * * The injured party must not be deprived of his remedy because of difficulties lying in the way of proving his damages, and the party who has wrongfully broken a contract should not be permitted to reap advantage from his own wrong by insisting on proof which, by reason of his breach, is unobtainable. * * * Reasonable certainty is all that is required, it not being necessary to show loss or damage with mathematical exactness. * *"

█ In North Texas Producers Ass'n. v. Young, 5 Cir., 308 F.2d 235, 244, it was said that courts tend to find a way for damages to be awarded when a wrong has been committed; that difficulty in proving the amount of damages should not be confused with the right to recover them; that when a wrongdoer makes it impossible to prove the amount of damages precisely, they should not be heard to complain of

the method of proof, if it is reasonable under the circumstances. Difficulty in proving the amount of damages does not prevent a recovery of damages.

Appellants say they made no claim that included appellees' losses and collected nothing for them. But, we agree with appellees that there is evidence from which the court and jury may have reasonably concluded that appellants managed to profit at appellees' expense. In September 1961, at a meeting between Zachry and Nichols, Zachry told Nichols, in effect, that Zachry-Brown had suffered losses, as G & N had, but that Zachry-Brown was going to take its losses without attempting to recoup from the government and that G & N should go and do likewise. At that time Strange, this project manager for appellants, had long been engaged in formulating a claim for losses on the entire job, including those incurred by appellees. At a meeting in December 1961, just after Strange had filed a claim for more than five million dollars, wherein there was sought more than one-half million dollars for losses caused by acceleration of concrete, which included losses for acceleration of reinforcing steel, appellants represented to appellees, in effect, that they had not presented, and would not present, a claim to the government. Appellees did not then know that appellants had already filed a claim including such things. Appellants' official, Mr. Morris, admitted said statement was wrong, stating that he did not then personally know of the claim presented by Strange, or of change order 117, by virtue of which about two and one-half million dollars was paid by the government to Zachry-Brown for losses caused by the government. In Mr. Zachry's oral deposition, taken in 1963, although he had personally negotiated the final settlement and obtained from the government $2,463,312.49 for such claimed losses, he said he had no idea of the amount collected on the claim. The jury may have doubted this, knowing that in the previous year he had personally negotiated the settlement for nearly two and one-half million

dollars. Another bit of evidence tending to support the finding that appellants collected for appellees the amount awarded therefor is that when the court ordered Zachry-Brown to produce all its agreements with the government the only one it failed to produce was the one that showed Zachry-Brown collected said amount from the government on said claim.

Nichols testified to large losses sustained by appellees by reason of acceleration of reinforcing steel, including the long hours its crews were required to work to complete the job on schedule. Such testimony was corroborated by a representative of Zachry-Brown, who was on the job continuously as its superintendent. No one for appellants denied that appellees' crews worked excessively long hours. Before G & N bid on the job of placing the steel its representatives discussed with Zachry-Brown, and it was understood that the sites were scheduled to be built three sites at a time, with crews working five days per week and eight hours per day. There was nothing then to indicate that much more would be required. Zachry-Brown's representative, Mr. Morris, who was consulted by G & N before it bid on the job, said that Zachry-Brown's basic plan was to construct the silos three at a time. This was corroborated by Mr. Chandler, chief estimator for Zachry-Brown. There was evidence that at the time G & N made its contract with Zachry-Brown the latter did not intend to pay much overtime. In July 1960, Morris wrote Moore, Zachry-Brown's project manager, directing that no further overtime be permitted on the job, unless required by extreme emergency. When G & N bid on the job of placing the reinforcing steel it anticipated employing ninety to one hundred men to work on not more than three sites at one time with a proportionate amount and type of equipment. By virtue of acceleration of all work required by the government it became necessary for G & N to have as many as two hundred men on its payroll at one time, to hire four to five hundred different men on the job, to work its crews as much

as seventy to eighty hours per week and to spread them over as many as nine sites at one time, working sometimes eighteen hours per day. Testimony noted with reference to inefficiency caused by working long hours is applicable to the losses sustained by appellees.

Appellees cite respectable authority for the proposition that the amount it recovered is supported under the theory that appellants stand in the position of a fiduciary; that, relative to the amount found to have been collected by appellants for appellees, appellants were trustees for their benefit and that once appellees established that appellants collected money for them the burden of proving the amount rested upon appellants. See Maxwell's Unknown Heirs v. Bolding, Tex.Civ.App., 36 S.W.2d 267; Fanderlik-Locke Co. v. United States, 10 Cir., 285 F.2d 939. After studying this large record we conclude that the amount found by the jury to have been collected by appellants for appellees, as reduced by remittitur, is supported by the evidence. Appellants' first 4 points are overruled.

■ We have considered and overruled appellants' contention that issues 1 to 4 constitute a comment on the weight of the evidence.

We overrule appellants' 31st, 33rd, 35th and 37th points to the effect that the court erred in submitting issues 1 to 4 because they were duplicitous and multifarious. Appellants say said issues inquired first whether appellees sustained losses; that some juror might have found that only one appellee suffered a loss while the other did not. This is not sound because appellees were joint venturers and in effect a single entity, just as H. B. Zachry Company and Brown and Root, Inc., constituted, in effect, one entity on this project. The issues were, therefore, not duplicitous in inquiring whether appellees sustained losses because such a loss was the loss of both appellees.

Appellants' contention that issues 1 to 4 are multifarious and duplicitous because

issue 1 inquired whether G & N and Ceco in erecting the reinforcing steel sustained losses of the same character as those described by Zachary-Brown in its claim is without merit. The record shows that appellees did sustain the same character of losses as those described by Zachry-Brown, as limited by the instruction accompanying issue 1. That question was submitted conjunctively, not disjunctively. Before it could be answered in favor of appellees the jury had to be convinced of both. Under these conditions such submission was not subject to the objections made and properly overruled. Meyer v. Great American Indemnity Co., 154 Tex. 408, 279 S.W.2d 575; Grieger v. Vega, 153 Tex. 498, 271 S.W.2d 85; Brown v. Brown, Tex.Civ.App., 256 S.W.2d 143; 3 McDonald, Texas Civil Practice, § 12.18, p. 1107 and Viduarri v. Bruni, Tex.Civ.App., 179 S.W.2d 818 (Ref. W.M.). The cases cited by appellants are distinguishable, for instance, Gulf States Utilities Co. v. Wooldridge, Tex.Civ.App., 90 S.W.2d 325 and Wichita Falls and S. R. Co. v. Lindley, 143 S.W.2d 428 are distinguishable because the issues there were submitted disjunctively, not conjunctively, as was done here. The losses inquired about in issue 1 were included in both claims. The amended claim did not eliminate any pertinent type of loss included in the first. Issue 1 did not inquire whether appellees sustained losses of the same character as those described by appellants in its claim of October "or" January. It inquired whether the jury found that appellees sustained losses of the same character as those described in both the October "and" January claims.

■ The jury found that (11) appellants failed to furnish G & N access roads surfaced and maintained so they could be used during normal adverse weather; that (12) appellees' loss, "if any", from such failure, if any, was $5,603.00. The court found that the answer to issue 12 included expenses claimed by Ceco amounting to $675.-29. A remittitur thereof was filed. The jury found in answer to issue 13 that ap-

pellants failed to furnish G & N storage areas surfaced and maintained so they could be used during normal adverse weather, which (14) cost G & N $5,603.00. The court found that answer included expenses of Ceco amounting to $675.29. A remittitur of said amount was filed. Appellants' contract required them to construct and maintain access roads to the missile sites and storage areas that would permit appellees to work there under normal adverse weather conditions. The contract between appellants and appellees included all provisions of appellants' contract with the government and specifically provided that appellants should furnish such access roads and storage areas. Contrary to appellants' contention that issues 12 and 14 constitute global submissions and are multifarious and duplicitous because they inquire, first, whether Zachry-Brown failed to furnish proper access roads and storage areas, second, whether G & N suffered a loss thereby and, third, the amount of G & N's loss, we think they were not global submissions, nor are they duplicitous or multifarious. Answers to issues 12 and 14 were predicated upon affirmative answers to prior issues inquiring whether Zachry-Brown failed to furnish the agreed roads and storage areas. Since issues 11 and 13 were answered "yes", as shown, issues 12 and 14 could not be multifarious because they also inquired, so appellants contend, whether appellants failed to furnish such access roads and storage areas. The jury had already found that Zachry-Brown failed to furnish such access roads and storage areas. Issues 12 and 14, finding the amounts of damages, could not have been answered as they were had the jury not previously answered issues 11 and 13 in the affirmative. Issues inquiring whether appellants failed to furnish proper access roads and storage areas were submitted separately, answered separately and in the affirmative. However, we think it was undisputed that appellants not only contracted to furnish and maintain such roads and storage areas, but that they failed to do so, and that G & N sustained a loss by reason thereof. Mr. Zachry testified

that if they were not maintained so they could be used during normal adverse weather the subcontractors would have to pay additional expenses. The evidence indicates, if it does not establish, that they were not so maintained. The testimony of Mr. Nichols concerning G & N's losses caused by appellants' failure to furnish such roads and storage areas and the government's records support the findings. It should be noticed that in submitting issues 12 and 14 inquiring what amount of money G & N lost as a result of appellants' failure to furnish the agreed access roads and storage areas, the court asked what sum of money, "if any", was lost and concluded, if any the jury had so found in answering previous issues. Under the authority of City of Austin v. Phipps, 162 Tex. 112, 344 S.W.2d 673, 676, and Stricklin v. Southwest Reserve Life Insurance Company, Tex.Civ. App., 234 S.W.2d 439, 442, (Writ Ref.), we hold that the court did not commit reversible error in so submitting said issues. We have considered and hereby overrule appellants' points 39–44 inclusive.

In answer to issues 1, 2, 3 and 4 the jury found, so far as is here material, that appellants collected from the government $260,673.00 for appellees. In answer to issues 12 and 14 the jury found that G & N sustained losses by reason of appellants' failure to furnish and maintain the contracted for access roads and storage areas, amounting to $9,855.42. The court allowed 6% interest on the $260,673.00 from the day it was found to have been collected for appellees and retained by appellants. Interest on the $9,855.42, as damages, was allowed from the time of appellees' loss. If interest is not allowed on the money found to have been collected for appellees and wrongfully withheld, appellants will receive the free use of appellees' money and be allowed to profit by what has been found to be their wrong. We think, contrary to appellants' able argument, the test is not whether the damages were unliquidated but whether appellants have had the free use of appellees' money and appellees have been

denied the use thereof since it was collected for them and retained by appellants and, as to other interest awarded, since the time appellees suffered such loss. We sustain said awards of interest before judgment. Texas Company v. State, 154 Tex. 494, 281 S.W.2d 83, 89; Watkins v. Junker, 90 Tex. 584, 40 S.W. 11, 12; Moore v. Barlow, 352 S.W.2d 804, 806, (Ref. N.R.E.); City of Sweetwater v. McEntyre, Tex.Civ.App., 232 S.W.2d 434, (Ref. N.R. E.). Certainly, as to interest from the time of collection and retention of the $260,-673.00 the judgment finds support in the decision of our Supreme Court in Texas Company v. State, supra, wherein interest before judgment was allowed as a matter of law as a part of the damages. In Watkins v. Junker, supra, our Supreme Court allowed recovery of interest before judgment on damages recovered for breach of contract, as was done here on the $9,855.42. It was there said to be recoverable from the time plaintiff was damaged, notwithstanding the damages were unliquidated, as compensation for the detention of that which was due on account of the breach, as an element of damages necessary to completely indemnify the injured party. There was no issue of fact to be submitted relative to such recovery of interest. Appellants' points 49–54 inclusive are overruled.

■ In answer to issues 34 and 35 the jury found that appellant withheld from G & N $25,036.00, which they owed G & N for erecting reinforcing steel and withheld from Ceco $88,403.30 that they owed Ceco for steel. We think there was actually no contest about appellants owing and withholding said sums, as "retainage". Appellants do not complain on appeal of that part of the judgment. But, during appeal, appellants tendered to appellees drafts for said amounts with interest at 6% from February 23, 1962 to April 7, 1965, the date of such tender. As a prerequisite to payment of said drafts, appellants required execution by appellees of their prepared partial releases of the judgment appealed from.

Appellants say they are not liable for interest on said amounts after the date of such tenders. In support thereof they cite Keystone Pipe & Supply Co. v. Zweifel, 127 Tex. 392, 94 S.W.2d 412, 415. Said points are overruled. The amounts tendered were insufficient because they did not include the attorneys' fees allowed thereon. Dawson v. Falfurrias State Bank, Tex.Civ.App., 181 S.W. 553, (Writ Ref.). They were also not shown to be valid tenders because. the only proof was that they tendered "drafts" for such amounts. This did not establish a legal tender. Cornelius v. Cook, Tex.Civ.App., 213 S.W.2d 767; Kansas City Life Ins. Co. v. Duvall, 129 S.W.2d 770; Baucum v. Great American Ins. Co. (Sup.Ct.) 370 S.W.2d 863. Point 57 is overruled.

■ In points 55 and 56 appellants insist the court erred in awarding attorneys' fees on the amounts owed by appellants to appellees and retained. By agreement, after conclusion of a jury trial, appellees' claim for attorneys' fees was submitted to the court. The court refused to allow attorneys' fees except for the amounts owed appellees for labor and material furnished. The amount awarded for attorneys' fees was $30,000.00. Appellants say appellees were suing for breach of contract and there is no evidence to support allowance of attorneys' fees. In support thereof they cite Article 2226; Parks v. Benson Company Builders, Tex.Civ.App., 393 S.W.2d 700, 704 and Ford Motor Company v. Davis Brothers, Inc., Tex.Civ.App., 369 S.W.2d 664, 668, (Ref. N.R.E.). As found by the jury, which finding was not appealed from, appellees furnished and placed the reinforcing in accord with their contracts with appellants. Appellants refused to pay Ceco $88,403.30, which they owed it for steel furnished and refused to pay G & N $25,-036.00 which they owed it for placing the reinforcing steel. Appellees sued to recover the amounts thus owed them for labor and material furnished. There was evidence of expert witnesses that, for the entire case, a reasonable attorneys' fee was

much larger than the amount allowed. However, under Article 2226, a person having a valid claim for labor done or material furnished may present same and if, after thirty days the claim is not paid and he later obtains judgment therefor he may also recover reasonable attorneys' fees. Appellees' claim for the amounts so withheld by appellants as retainage was for labor done and material furnished within the meaning of that statute. We so held in Ferrier Brothers v. Brown, Tex.Civ.App., 362 S.W.2d 181, (Ref. N.R.E.). See also United States for the Use and Benefit of Caldwell Foundry and Machine Co. v. Texas Construction Co., 5 Cir., 237 F.2d 705 and Ferrous Products Co. v. Gulf States Trading Co., 160 Tex. 399, 332 S.W.2d 310. Appellants' authorities are distinguishable and do not require a different conclusion.

Appellants' 45th and 48th points have been considered and are overruled.

Appellants present points with reference to the admission of evidence. All of appellants' points not expressly passed upon have been considered and are overruled. The judgment for appellees against appellants is affirmed.

■ We shall now consider the cross appeal of Ceco and G & N. Appellees first complain of the court disregarding the answers to issues 15–17 and refusing to enter judgment for G & N thereon, because, they say, there was sufficient evidence to support findings that (15) the overhead bridges erected at Oplin, Baird and Denton before G & N placed the reinforcing steel unduly interfered with G & N's work; that (16) Zachry-Brown thereby failed to coordinate its work with that of G & N and (17) as a result G & N lost $28,777.00. Zachry-Brown filed a motion to disregard said answers because there was no evidence Zachry-Brown thereby breached any obligation it owed G & N; that under the contract between Zachry-Brown and the government, by which appellees were also bound, appellants were required to submit to and obtain the approval of the govern-

ment of its plans and methods of construction, which appellants did; that appellants, as a part of their plans and methods of construction, provided for erection and maintenance of said overhead bridges and they had no right to remove them without approval of the government; that the plans therefor were submitted to and approved by the government before G & N's subcontract, subject thereto, was made. The undisputed evidence shows that Zachry-Brown's plan to erect said bridges was made in February, 1960; that they were needed to support large, heavy anchors installed in concrete walls of the silo shaft to support the steel frame of what amounted to an eight story building hung from the walls of the silos. After the contract for erection of the bases was awarded to Zachry-Brown, plans for said bridges were submitted to the Corps of Engineers and approved by it on July 7, 1960. Their erection was a part of the program of construction before execution of G & N's subcontract on August 31, 1960, which was subject thereto. In their subcontract G & N agreed to perform its work "in accordance with the program of allied operations of the contractor—". Erection of said bridges did not constitute a breach of any obligation appellants owed G & N. Appellees said points are overruled. De Puy v. Lone Star Dredging Company, Tex.Civ.App., 162 S.W.2d 161, (Ref. W.O.M.); Housing Authority of City of Dallas v. Hubbell, Tex. Civ.App., 325 S.W.2d 880, 898, (Ref. N. R.E.).

■ By cross point 2, appellees complain that the court disregarded the answers to issues 18–20, because there was sufficient evidence to support findings that (18) while G & N was working on the silos it was unduly interfered with by Zachry-Brown; that (19) Zachry-Brown failed to coordinate its work with that of G & N to avoid undue interference with it in the silos and that a (20) $14,022.84 loss was thereby sustained. Zachry-Brown's motion was properly sustained because there was no evidence Zachry-Brown thereby breached

any obligation it owed G & N; that G & N's subcontract provided it would do its work in accord with the allied operations of Zachry-Brown; that the evidence relating to said issues showed that government change orders required the crews of both to then work there. Zachry-Brown is not liable for the effect of the government's change orders. The only evidence relative to said disregarded issues was based upon the effect of government change orders for which appellants are not liable to appellees. As shown in our disposition of appellees' cross point 1, no breach of contract was shown. Under the contractual relationship between appellants and G & N the latter was obligated to do its work in accord with the terms and conditions of the contract between appellants and the goverment. Appellees assumed towards Zachry-Brown the same obligations Zachry-Brown owed the government. Zachry-Brown's contract contemplated, and the government required, working of said crews there simultaneously and G & N was required to conform its operations to appellants. This alleged loss by G & N is based upon the effect of the government's change orders. This was contemplated by G & N's contract and appellant was not liable for their effect. Change in the work contemplated by appellees' contract was not required. United States v. Rice, 317 U.S. 61, 63 S.Ct. 120, 87 L.Ed. 53. The court did not err in refusing to render judgment on said answers.

■ Appellees' cross point 3 asserts the court erred in disregarding the answers to issues 21–23 because there was sufficient evidence to support said findings. Appellants moved to disregard said answers because there was no evidence to support them, contending there was no competent evidence of appropriation of steel by Zachry-Brown but that the evidence showed a part thereof was used by the Corps of Engineers. Appellants say, and we think

correctly, that the evidence of such conversion was hearsay and the objections thereto should have been sustained. But, under Henry v. Phillips, 105 Tex. 459, 151 S.W. 533, 538, whether objected to or not, it cannot be considered in support of said answers. We conclude that there was no competent evidence of conversion by appellants, or if so, the value thereof. Evidence of what appellees paid for the missing steel was not competent evidence of its market value at the time and place it was alleged to have been converted by appellants. Appellees' said point is overruled.

■ Appellees contend (4) the court erred in disregarding the answers to issues 24–29 because there was sufficient evidence to support findings that, (24) prior to construction of caps on the silos, appellants represented to Ceco that the parapet wall would not be poured before steel was placed; that (25) Ceco relied thereon and, (26) relying thereon, Ceco ordered extra reinforcing steel. That, (27) Zachry-Brown poured the parapet wall before the steel was placed and (28) Ceco thereby sustained a loss of $20,916.00. The only damages alleged were for the increase in the cost of labor, overhead expense and crane rental. There was no competent evidence thereof. As shown by appellants, the evidence related to the cost of extra steel, which was not included in said alleged damages. Appellants timely and properly objected to introduction of such evidence and submission of said issues because there was no pleading thereof. No breach of appellees' contract was thereby shown. The pouring of the parapet wall was a part of appellants' known program, provided for by the prime contract, of which appellees had notice and, subject to which, they signed their subcontracts. Appellees' cross points are overruled.

We think reversible error is not shown. The judgment is affirmed.